No. 84-172

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

THE MILLER-WOHL COMPANY, INC.,

     Petitioner and Respondent,

-vs-

COMMISSIONER OF LABOR AND INDUSTRY,
STATE OF MONTANA, AND TAMARA L. BULEY,

     Respondents and Appellants.

---

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

    For Appellants:

        R. Scott Currey argued, Dept. of Labor & Industry,
Helena, Montana
Tipp, Hoven, Skjelset & Frizzell; Richard R. Buley
argued for Tamara Buley, Missoula, Montana

    For Respondent:

        Church, Harris, Johnson & Williams; Cresap S. McCracken,
Great Falls, Montana
Charles L. Fine argued for Miller-Wohl Co., Phoenix,
Arizona

    For Amicus Curiae:

        Kathleen H. Richardson for Women's Law Section, Havre,
Montana
Patten & Renz; Jeffrey Renz for American Civil
Liberties Union, Billings, Montana
Kathleen F. Holden for Montana Human Rights Commission,
Helena, Montana
Hilley & Loring; Emilie Loring for Montana Education
Association, Great Falls, Montana

---

           Submitted: September 26, 1984

            Decided: December 28, 1984

Filed: DEC 28 1984

*Ethel M. Harrison*

---
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This is an appeal by Tamara L. Buley and the Commissioner of Labor and Industry from a judgment of the District Court, Eighth Judicial District, Cascade County, finding the Montana Maternity Leave Act invalid and reversing a decision of the Commissioner in favor of Tamara for back wages and penalties.

We reverse the judgment of the District Court.

We determine for the purpose of this action that the employment policy of Miller-Wohl was one of no leave of absence for temporarily disabled employees until the end of their first year of employment.

In short summary of our decision, we make the following determinations:

(1) Miller-Wohl's discharge of Tamara because of her pregnancy was in direct violation of the Montana Maternity Leave Act (MMLA). Moreover, as Title VII of the Civil Rights Act of 1964, and the Pregnancy Discrimination Act of the federal government are interpreted by federal regulations, it appears that Miller-Wohl's no leave policy and discharge of Tamara may have violated those federal acts.

(2) Usually an attack on legislation alleged to be discriminatory is mounted by a person discriminated against. In this case Miller-Wohl, as an employer, was not discriminated against by the MMLA, but it nevertheless has standing to raise validity of MMLA.

(3) Miller-Wohl's no-leave policy created a disparate effect on women who become pregnant, compared to those employees who do not become pregnant. Although facially

neutral, its no-leave policy subjected pregnant women to job termination risk on a basis not faced by men. The no-leave policy therefore was sexually discriminatory in violation of Title VII and the Pregnancy Disability Act.

(4) The policy and purpose of Title VII and the PDA is to eliminate discrimination in employment policies.

(5) Miller-Wohl's termination of Tamara directly violated the MMLA. The policy and purpose of the MMLA is to protect equal job opportunities for women as compared to others by removing a female disability job risk not faced by men and non-pregnant females. Its objective in that field, equality, is the same as the objective of Title VII. We do not agree that MMLA violates Title VII because it is gender-based in its operation, in that it protects women without at the same time protecting others equally.

(6) By the simple expedient of requiring an employer to extend the same leave rights to all employees temporarily disabled as are extended to pregnant women under the MMLA, the Montana legislative purpose to provide women equality of opportunity in employment could be preserved, and the provisions of the MMLA and Title VII reconciled.

(7) Courts have recognized judicial power in discrimination cases to save the legality of questioned legislative enactments by the doctrine of extension, extending the same benefits to those who would otherwise be discriminated against. This case presents a proper one for judicial extension. However, because the legislature is meeting shortly we defer to the legislature for its action in this field.

(8) We find the MMLA valid.

I.

Miller-Wohl hired Tamara Buley as a retail sales clerk at its Three Sisters store in Great Falls, Montana on August 1, 1979. She was employed to work full time (34-36 hours a week) during the store's two busy months, August and December, and part-time (16-20 hours a week) for the rest of the year. She was, according to the store manager, a "regular employee."

Tamara missed two and a half days of work during her first week on the job because of what she thought was the 'flu. On August 13, 1979, she discovered she was pregnant and soon after told her supervisor. During the next two weeks she suffered from "morning sickness." She felt nauseated and faint, and as a result missed time from work, had to leave the selling floor for breaks, and spent considerable time in the store bathroom vomiting, and was sent home early on occasion. On August 27, 1979, Miller-Wohl terminated Tamara's employment, undoubtedly because her pregnancy diminished her effectiveness as a sales clerk.

Tamara filed a complaint against Miller-Wohl with the Montana Commissioner of Labor and Industry (Commissioner). She claimed that Miller-Wohl had violated the Montana Maternity Leave Act (MMLA).

Miller-Wohl then brought suit against the Commissioner and Tamara in United States District Court for the district of Montana, asking the federal court to declare the MMLA invalid and to enjoin its enforcement. The court issued a temporary restraining order for a brief period, but then permitted the state agency to proceed.

On October 1, 1980 the Commissioner held a hearing and on October 3, 1980 issued an administrative order with

findings of fact and conclusions of law that Miller-Wohl had violated the MMLA by dismissing Tamara Buley; that the MMLA neither offended Equal Protection guaranties nor was preempted by Title VII of the Civil Rights Act of 1964; and that Tamara was entitled to back pay and penalties in the amount of $6,573.60.

The federal district court concurred in the Commissioner's conclusions. Miller-Wohl Co. v. Commissioner of Labor and Industry, 515 F.Supp. 1264 (U.S.D.C. Mont. 1981). In addition the federal court found that Miller-Wohl could comply with the PDA and MMLA by simply granting leave to all employees who miss work because they are sick or disabled. 515 F.Supp, at 1267.

The decision of the federal district court was appealed to the U.S. Court of Appeals for the Ninth Circuit. That court determined none of the issues. Instead it concluded that Miller-Wohl's complaints failed to present an affirmative federal claim over which the court could assert jurisdiction and dismissed the action. Miller-Wohl Co., Inc. v. Commissioner of Labor and Industry, et al. 685 F.2d 1088 (U.S.C.A. 9, 1982). This dismissal left the District Court opinion without precedential effect.

Miller-Wohl also petitioned the state court for a review of the Commissioner's decision. On February 8, 1984, the District Court for Cascade County reversed the Commissioner's order. The District Court held that the MMLA is discriminatory, is a denial of equal protection of the law, is a protective and preferential statute favoring nondisabled pregnant employees to the discrimination of disabled nonpregnant employees and disabled male employees, and is

preempted by Titles VII and XI of the Federal Civil Rights Act.

The Commissioner and Tamara appeal from the decision of the District Court, which brings the case to us for determination.

## II.

The MMLA was adopted by the legislature in 1975 (formerly Section 39-7-201, -208, MCA, (1978); now Section 49-2-310, -311, MCA, (1983).) It provides in pertinent part:

> "Maternity Leave -- Unlawful Acts of Employers. It shall be unlawful for an employer or his agent to:
>
> "(1) terminate a women's employment because of her pregnancy;
>
> "(2) refuse to grant to the employee a reasonable leave of absence for such pregnancy;. . ."

The MMLA is a legislative recognition of changing economic mores in American family life. We are told that in 40% of American households there is a working wife or mother. A growing number of single women support themselves, or themselves and children. In family households the need for two paychecks spreads across the economic spectrum. Even young upwardly-mobile professionals (Yuppies), like a biplane, need two wings working to stay aloft. Economic necessity has converged with the growing insistence of women for equal opportunity in all fields to bring about legislative enactments such as the MMLA. The biblical imprecation that the male shall eat his bread by the sweat of his brow has been broadened; Eve is now included.

Congress has responded to these forces by including in the Civil Rights Act of 1964 provisions outlawing discrimination in employment because of gender. Section

- 6 -

703(a)(1) of the Act provides that it is an unlawful employment practice for an employer:

"to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, <u>because</u> <u>of</u> <u>such</u> <u>individual's</u> <u>race</u>, <u>color</u>, <u>religion</u>, <u>sex</u>, <u>or</u> <u>national</u> <u>original</u>, . . ." 42 U.S.C. §2000e-2(a)(1)

The provisions of the Civil Rights Act of 1964 relating to sex discrimination in employment (hereafter Title VII) were tested in General Electric Co. v. Gilbert (1976), 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343. General Electric, as a self-insurer, had provided nonoccupational sickness and accident benefits to all its employees amounting to 60% of their straight-time weekly earnings up to a maximum of 26 weeks. Several women employees became pregnant while employed by General Electric, and while the plan was in effect, and presented a claim to the company for disability benefits under the plan to recover for the period while each was absent from work as a result of the pregnancy. The claims were routinely denied on the ground that the plan did not provide disability benefit payments for any absence due to pregnancy. The women employees charged that the refusal of General Electric to pay disability benefits under the plan for time lost due to pregnancy and child birth discriminated against them because of sex, and so violated Title VII. The United States Supreme Court refused to recognize the propriety of an Equal Employment Opportunity Commission guideline that pregnancy disability should be treated on the same terms and conditions as other temporary disabilities, and held that pregnancy-related disabilities constitute an additional risk unique to women, and that the failure of General Electric to compensate women for this risk did not

- 7 -

destroy the presumed parity of the benefits accruing to men and women alike which resulted from the facially evenhanded inclusion of risks in General Electric's Plan.

The congressional response to the decision in Gilbert was an amendment in 1979 to Title VII to include the Pregnancy Disability Act, Section 701(k)(PDA). The pertinent provision of PDA is:

> "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in Section 703(A) of this Title shall be interpreted to permit otherwise . . ."

The outpouring of congressional statements at the time of the passage of PDA in the House and Senate Reports and by House members and senators on the floors of their respective houses indicate the passion and determination of congressional members to ban discrimination of all types in employment practices. Illustrative with respect to the PDA was the House Report:

> "As testimony received by this Committee demonstrates, the assumption that women will become pregnant and leave the labor force leads to the view of women as marginal workers, and is at the root of the discriminatory practices which keep women in low paying and deadend jobs. H.R.6075 [PDA] unmistakenly reaffirms that sex discrimination includes discrimination based on pregnancy and specifically defines standards which require the pregnant workers be treated the same as other employees on the basis of their ability or inability to work." 5 U.S. Code Cong. & Admin. News 4749, 4751 (1978).

In adopting the Civil Rights Act of 1964, and the PDA, Congress indicated its intention to permit state action consistent with those acts. Section 42 U.S.C 2000h-4 reads:

"Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such Title operates or to the exclusion of state laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of state law unless such provision is inconsistent with any of the purposes of this Act, or any provisions thereof."

Title VII of the Act, concerning employment discrimination also contains a section, Section 42 U.S.C. 2000e-7 which reads:

"Nothing in this subchapter [Title VII] shall be deemed to exempt or relieve any person from any liability, duty, penalty or punishment provided by any present or future law of any state or of any subdivision of a state, other than any such law which proports to require or permit the doing of any act which would be an unlawful employment practice under this chapter."

One further provision of the MMLA should be noted. Reinstatement of the pregnant employee after leave of absence is required in the Act. Former Section 39-7-204 (now Section 49-2-311) provides:

"Reinstatment of job following pregnancy-related leave of absence. Upon signifying her intent to return at the end of her leave of absence, such employee shall be reinstated to her original job or to an equivalent position with equivalent pay and accumulated seniority, retirement, fringe benefits and other service credits, unless in the case of a private employer, the employer's circumstances have so changed as to make it impossible or unreasonable to do so."

The foregoing paragraphs summarize the federal and state enactments under which Tamara's case must be resolved.

III.

The issue to be decided here is whether the MMLA is invalid because of, or preempted by, Title VII and the PDA. If the answer is affirmative, Tamara has no case and the judgment in the District Court must be affirmed.

On her appeal Tamara contends that the MMLA is consistent with the purposes of Title VII which is to

- 9 -

eliminate employment discrimination between the sexes; that the MMLA does not violate Title VII because it does not limit, deprive or adversely affect the employment opportunities of any individual; that the MMLA which grants reasonable leave for pregnancy disabilities is not a state protectionist law in violation of Title VII; that the MMLA is not preempted by Title VII for the reason that Congress did not intend to preempt state laws by the passage of PDA and in fact specifically examined and approved the MMLA; that MMLA is not unconstitutional as a denial of Equal Protection Laws because pregnancy disability laws are not subject to constitutional scrutiny, but if they are, the MMLA bears a close and substantial relationship to the legitimate state objective of eliminating employment discrimination against women because of pregnancy.

The Commissioner contends that the MMLA, viewed in the light of the purposes of Title VII, is not inconsistent with federal law and so is not preempted by the same; in addition he contends that Miller-Wohl may not attack the MMLA with a policy which in itself violates Title VII; Commissioner further contends with respect to the Equal Protection argument that legislation based on pregnancy is not a gender-based classification for the purpose of equal protection analysis and need only be justified on a reasonable basis, but even so, the MMLA could survive the more difficult test for gender-based classifications, in that the MMLA bears a substantial relationship to an important state interest.

The Montana Human Rights Commission, appearing amicus curiae, supports the constitutionality and validity of the MMLA, contending that the federal constitution does not

prohibit the use of gender-based classifications; that the MMLA bears a close and substantial relationship to important government objectives; that the individual dignity section of Article II of the Montana Constitution does not prevent the exercise of the legislature's power to enact statutes containing gender-based classsfications; that the MMLA is not preempted by the federal acts; and that in the alternative, this case is not ripe for decision by us on constitutional grounds and we should remand the case for further proceedings rather than hold MMLA unconstitutional.

The combined brief of the American Civil Liberties Union, the National Organization for Women, the NOW Legal Defense and Education Fund, and the League of Women Voters, appearing amici curiae, while supporting the objective of Tamara generally, takes a somewhat different tack. These amici contend that if this Court construes the MMLA to permit employers to grant greater employment benefits to pregnant employees than to others similar in their ability or inability to work, the MMLA would conflict with Title VII; on the other hand, the MMLA and Title VII impose complementary obligations on employers and so this Court should declare that Montana employers must comply with both statutes to remove any apparent conflict between the two. Therefore this Court should extend MMLA's provisions in a nondiscriminatory fashion rather than invalidate the statute and deny all Montana citizens a benefit the legislature intended to confer.

On the other hand, Miller-Wohl, as the respondent on appeal, contends that the MMLA is defective because it does not require the pregnant employee to be disabled from working in order to be eligible for a leave of absence or protected

from discharge, and it is therefore discriminatory as to other employees of Miller-Wohl; that the District Court was correct when it found that the MMLA was preempted and superseded by and in violation of Titles VII and XI of the Civil Rights Act; that the MMLA is a protective and preferential statute and conflicts with Title VII in that it is impossible for a Montana employer to comply with the MMLA and Title VII at the same time; that the MMLA violates the Equal Protection Clause of the Fourteenth Amendment because it provides different treatment of persons on the basis of their sex; that in determining the equal protection argument the intermediate test or affirmative action test should be applied; and that the MMLA has no close or substantial relationship to any governmental interest.

The Women's Law Section of the State Bar of Montana, appearing amicus curiae, supports the appellants in contending that the MMLA is not preempted by Title VII; that under traditional equal protection analysis the MMLA does not create a gender-based classification; but if the MMLA does create a gender-based classification, it is not an invidious discrimination.

The Montana Education Association, appearing amicus curiae, also supports the appellants, contending that the MMLA is not preempted, and does not violate constitutional equal protection guarantees; that it is not an unlawful protective legislation, and that it protects an important state governmental interest.

III.

Miller-Wohl is a chain that operates about 290 ladies' wear stores throughout the United States. Four such stores are located in Montana.

- 12 -

On the face of them, the written employment policies of Miller-Wohl are nondiscriminatory. The employment policies are printed in a booklet, at least one copy of which is kept at each store, sometimes distributed to employees (Tamara says she did not receive one), and the provisions explained and discussed with the store managers at employee meetings. The written employment policies contain the following provisions which are pertinent to this case:

"It is the policy of the Miller-Wohl Company to forbid acts of discrimination in all matters dealing with employees . . .

"It has been the established policy of Miller-Wohl to provide equal employment opportunties to all qualified applicants who seek job opportunities with the Company at every level of employment. Hence, we do not discriminate against anyone because of race, color, age, sex, or religion.

". . .

"11. Sick Leave:
All regular full-time employees with one year seniority are entitled to receive up to five days of sick leave with pay for legitimate illness incurred during the calendar year.

". . .

"16. Leaves of Absence:
All employees, after one year of seniority, may receive a leave of absence in cases of protracted illness. Such leaves of absence shall be for three months. If the employee requires more than three months, an additional three months may be granted upon reapplication.

"All other types of leaves are strictly within the discretion of the Manager.

". . .

"17. Maternity:
When an employee leaves for pregnancy, she will be granted a leave of absence for a period of time that includes the post-natal physical examination.

". . .

"22. Time Off:
If you need to have time off from your job, make your request to your Manager. A limited amount of time off may be granted for good reason.

- 13 -

"Absence is considered to be excused for the following reasons only:

"1. Illness certified by doctor's certificate; 2. A death in the employee's immediate family; 3. A wedding in the employee's immediate family; 4. With the Manager's permission.

". . .

"28. Extension of Benefits:
The benefits described herein are intended primarily for the regularly working employee. As such, the benefits are directed toward the full-time and regular part-time employees. These benefits, however, may be extended to other employees within the discretion and approval of your Manager and District Supervisor."

It maybe gleaned from the foregoing paragraphs of the employment policies of Miller-Wohl that all employees may receive a leave of absence without pay in cases of protracted illness. In cases of maternity, there is a provision that the woman will be granted a leave of absence for a period of time that includes post-natal physical examination. Regular full-time employees with one year seniority earn sick leave based on the years in service. Time off for good reason will be granted; and finally those benefits which are intended primarily for the full-time and regular part-time employees may also be extended to other employees in the discretion of the manager.

Because the written policies indicate that Miller-Wohl would extend to pregnant women a reasonable leave of absence to cover their disabled time, without pay, it is suggested to us by the ACLU, NOW, and the League of Women Voters that this clause should be remanded for clarification of dispositive factual issues as to whether Miller-Wohl granted such leaves, and under what circumstances. Undoubtedly, evidence that Miller-Wohl had granted some employees leave for an appendectomy, a broken limb, or other reason, but had refused

- 14 -

Tamara leave for her pregnancy disability would automatically suggest that Miller-Wohl applied its discretionary leave in a discriminatory way. McDonald Douglas Corp. v. Green (1973), 411 U.S. 792. We decline to take that position, however, because under the testimony in this case, Miller-Wohl's actual handling of leave for pregnancy cases belies the benign provisions of its written employment policies. The area supervisor for Miller-Wohl testified:

"Q. In regard to the one year requirement, as a supervisor and earlier when you were a store manager, was there meetings with the store managers by the supervisor in regards to these items? A. Yes.

"Q. What was said if anything in regards to this ah, maternity leave and sick leave benefits provisions? A. It was pointed out that in the company's manual that unless an employee had been in employment with us for a minimum of one year the policy would not be deviated from. It would hold true.

"Q. And this policy applies to male and female employees? A. Yes it does.

"Q. Have you had employees with less than one year of employment who are pregnant, or sick, or ah injured, or ah, I mean an off the job injury or other reasons for a leave of absence to be requested and not granted? A. Would you like to rephrase that one more time? You talk too fast.

"Q. Try again. Sorry. Have you had employees with less than one year of employment who have been pregnant, or ill, or injured, or some other meritorious reason for requesting or seeking leave of absence? A. No one has ever been given leave of absence without being employed for us for one year at least."

The store manager from the Great Falls store testified:

"Q. Did Tamara Buley have a guide? A. It was made available to her, yes.

"Q. Did you discuss it with her? A. Yes we did.

"Q. Did you discuss the one year requirement for benefits? A. Yes we did.

"Q. Is that discussion of the one year benefit brought to the attention of the employees? A. It

- 15 -

was brought to the attention of any one that comes to work in the store."

The testimony of the area supervisor and of the Great Falls store manager makes it clear that despite the language contained in the employment guide provisions which relate to employment policy, in actuality Miller-Wohl conducts a policy of no leave for any disabled employees with less than one year employment experience with Miller-Wohl. We therefore determine this case in the circumstance that in actual practice Miller-Wohl extended no leave of absence from employment to any temporarily disabled employee until the end of the first year of employment.

## IV.

Under the MMLA, it is unlawful in Montana for an employer to terminate a woman's employment because of her pregnancy, or to refuse to grant the employee a reasonable leave of absence for such pregnancy. Miller-Wohl clearly violated this statute. Section 49-2-310, MCA (1983).

Therefore, unless the MMLA is invalid as contended by Miller-Wohl, the Commissioner was correct in determining a violation of the MMLA had occurred, and that Tamara was entitled to back pay and penalties for her wrongful discharge. See section 49-2-311, MCA (1983).

The latest pronouncement by the United States Supreme Court of which we are aware in the field of pregnancy-related employment practices is Newport News Ship Building And Dry Dock Company v. EEOC. (1983), _____ U.S. _____, 103 S.Ct. 2622, 77 L.Ed.2d 89.

In Newport News, the employer had provided a health insurance plan which contained hospitalization benefits for pregnancy-related female disabilities but provided less

extensive pregnancy benefits for spouses of male employees. The Supreme Court held that the limitation of benefits for spouses of male employees discriminated against the male employees in violation of section 703(a)(1) of Title VII. In holding that Congress by enacting the PDA had overturned the Supreme Court's holding of General Electric Co. v. Gilbert, supra, the Supreme Court found that differential treatment of pregnancy is gender-based discrimination because only women can become pregnant, that the PDA makes it clear that discrimination based on pregnancy is on its face discrimination based on sex and that it is discriminatory to exclude pregnancy coverage from an otherwise inclusive benefits plan.

Tamara's case presents a somewhat different aspect than Newport News. Female spouses of male employees were not included in the Newsport News benefits plan though female employees were; in Miller-Wohl's case its no-leave policy for employees under one year of employment experience applies equally to male and female employees.

While Miller-Wohl's no-leave policy was facially neutral as to Tamara and her class, it should not escape us that Tamara is not so much before us because of refusal to grant her pregnancy leave. She was in fact terminated from her employment. She was discharged because she was pregnant. Title VII provides that it is an unlawful practice for an employer to discriminate against any individual with respect to his employment "because of . . . sex." Under the PDA, the term "because of sex" includes "because of . . . pregnancy . . . ; women affected by pregnancy . . . shall be treated the same for all employment related purposes . . . as other persons not so affected but similar in their ability or

inability to work . . ." Section 701(k), PDA (42 U.S.C. 2000e(k)).

When Title VII as amended by the PDA is understood properly, it becomes clear that the discharge from her employment of a woman for her pregnancy, without more, is an unlawful practice under Title VII and the PDA. It is a gender-based discrimination. The discharged pregnant woman is not treated the same for all employment-related purposes as all other persons not so affected, obviously, because men cannot be discharged for the same reason. The intent of Title VII and the PDA that women should be treated equally with men on matters of employment means that women cannot be discharged simply because they are pregnant.

Tamara's disability came relatively early in her pregnancy. Not all women suffer from "morning sickness." Many pregnant women seem to be able to work nearly to the hour of their delivery, and to return to employment shortly after delivery. Inevitably, however, childbirth involves some period of disability. Testimony before the House Committee on Education and Labor, considering the adoption of the PDA, indicated that normal period of pregnancy leave is about six weeks. HR Rep. No. 95-948, 5 U. S. Code Congressional and Administrative News 4749, 4753 (1978). An employer's no-leave policy therefore poses a drastic effect on women employees of childbearing age, an impact no male would ever encounter.

In Abraham v. Graphic Arts International Union (USCA 1) (1981), 660 F.2d 811, the employer of a temporary employee had a policy of granting ten days leave and no more to any disabled employee. Abraham was hired for a temporary project, as long as it received funding. She was discharged

for work absence incidental to her impending motherhood. She had been given no leave of absence for her pregnancy. The circuit court held:

> "An employer can incur a Title VII violation as much by lack of an adequate leave policy as by unequal application of a policy that it does have. Title VII outlaws employment discrimination traceable to an employee's gender, and it takes little imagination to see that an omission may in particular circumstances be as invidious as positive action. As the Equal Employment Opportunity Commission had declared:
>
> "'[W]here the termination of an employee who was temporarily disabled is caused by an employment policy under which insufficient or no leave is available, such a termination violates the Act if it has a disparate impact on employment of one sex and is not justified by business necessity.'
>
> "Beyond peradventure, the limitation of leave to ten days affected women employed in PEP program much more severely than any male engaged therein, or elsewhere in the union's hire. It therefore cannot afford the union refuge unless demonstrably it was required by the exigencies of the project, a matter to which we now turn." 660 F.2d at p. 619."

The Abraham case was remanded by the Circuit Court to the United States District Court for the reason that summary judgment in favor of the employer was improper. The reasons given by the circuit court for the remand are cogent in this case, for the principle remains the same, the employer provided a leave policy that was inadequate for pregnant women and gender-based in its impact upon one sex as compared to the other.

Miller-Wohl's no-leave policy created a disparate effect on woman who become pregnant compared to men who do not become pregnant. Although the policy was facially neutral, it nonetheless subjected pregnant women to job termination on a basis not faced by men. The no-leave policy therefore appears to us to be gender-based discrimination by an employer in violation of Title VII and the PDA.

## V.

The appellants point out that usually an attack on legislation because of its discriminatory effect is mounted by a person discriminated against. Here Miller-Wohl as an employer was not discriminated against. Appellants therefore claim that Miller-Wohl has no standing to claim that the MMLA was discriminatory. We conclude however that the impact upon Miller-Wohl is direct and substantial and it has standing to raise the validity of the MMLA as such an employer.

## VI.

Sorting out the legal issues in this case is like walking through a hall of mirrors, so many facets are presented; or it is like examining a bagful of inconsistencies, such differing interpretations of the federal and state statutes are given us.

Miller-Wohl violated MMLA; it claims not to have violated Title VII, and the PDA, but to have complied with the letter of those federal laws. Miller-Wohl claims it cannot obey both sets of laws.

The District Court and Miller-Wohl find that the MMLA is protectionist legislation favoring one sex above the other.

Yet the District Court held, and Miller-Wohl contends, that the MMLA is not gender-based, because MMLA discriminates in favor of pregnant women over non-pregnant women.

Tamara, the Commission, and most amici see no conflict between the MMLA and Title VII, as amended by PDA; they contend that the objectives of the state and federal legislation are the same, to provide for equality for women on the job market.

The ACLU, NOW, and the League of Women Voter's see in MMLA the kind of protectionist legislation that historically

hurt rather than helped women, and kept them in marginal jobs; yet these amici would preserve the MMLA by judicially extending its benefits to all sexes.

The Commissioner sees no gender-based discrimination in MMLA, pointing to the protection of both sexes by preserving the right of husbands and wives to procreate and raise a family without sacrificing the income of the wife to support the family after pregnancy.

In the construction of statutes, we are directed by law to construe their provisions liberally with a view to effect their objects and to promote justice; when a statute is equally susceptible to two interpretations, one in favor of natural right and the other against it, the former is to be adopted. Sections 1-2-103, -104, MCA.

In attacking the MMLA, Miller-Wohl contends that the Montana statutes are in violation of the equal protection clause of the federal constitution, are discriminatory, and are preempted and superseded by and in violation of Titles VII, and XI, of the Civil Rights Act.

First Miller-Wohl states that the MMLA favored nondisabled pregnant employees to the exclusion of all other employees. It points to an internal difference found within the MMLA:

"It shall be unlawful for an employer or his agent to:

"(1) Terminate a woman's employment because of a pregnancy;

"(2) Refuse to grant to the employee a reasonable leave of absence for such pregnancy;

"(3) Deny to the employee who is disabled, as a result of pregnancy any compensation to which she is entitled to the accumulation of disability or leave benefits accrued pursuant to plans maintained by her employer, provided that the employer may require disability as a result of said pregnancy to

- 21 -

be verified by medical certification that the employee is not able to perform her employment duties;. . ."

Miller-Wohl claims that subsections (1) and (2) of section 49-2-310, MCA, apply to all employees who are pregnant, and not to employees who are disabled as a result of pregnancy, in contrast to subsection (3) which specifically delineates the pregnant employee who is disabled as a result of such pregnancy. Thus, Miller-Wohl claims that the provisions of MMLA require an employer to grant maternity leaves of absence to nondisabled pregnant employees as well as to pregnant employees and in that manner is discriminatory, protective, preferential, and in contradiction of Title VII.

Miller-Wohl further contends that MMLA offends Title VII of the Civil Rights Act as amended by the Pregnancy Disability Act, section 701(k) with respect to the following language:

". . . and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this Title shall be interpreted to permit otherwise . . ."

Miller-Wohl contends that the federal law requires equal employment policy only when the pregnant employee is disabled and therefore the state law is in conflict with the federal law.

We reject Miller-Wohl's arguments on these points. Miller-Wohl is arguing on a statement of facts that are not before this Court, and were not before the District Court nor the Commission. We are not considering in this case a nondisabled pregnant employee. Tamara Buley was disabled by

virtue of her pregnancy, and eventually was discharged for that disability.

Disability as a result of pregnancy is not the sine qua non for the application of PDA; it requires no more than the "medical condition" of pregnancy. The PDA states:

"The terms 'because of sex' or 'on the basis of sex' include, but are not limited to because of or on the basis of pregnancy, childbirth or related medical conditions . . ." 42 U.S.C. 2000e(k).

We agree with Judge Paul G. Hatfield, who determined this argument with clarity:

"First, under the Equal Protection Clause, as contrasted with the statutory Pregnancy Discrimination Act discussed infra, men and women are not treated unequally when pregnancy is the one physical condition given preferential treatment. Rather, by removing pregnancy-related disabilities as a legal grounds for discharge from employment, the MMLA places men and women on more equal terms. All workers, male or female, disabled for any reason other than pregnancy are still treated identically. Whether the disability or sickness is one that members of either sex could suffer, such as a broken leg, or hepatitis--or is one that members of only one sex could suffer--such as a ovarian cyst or prostatitis--the MMLA still permits plaintiff to treat workers under its leave policy with equal severity. The MMLA merely makes it illegal for an employer such as plaintiff [Miller-Wohl] '. . . to burden female employees in such a way as to deprive them of employment opportunities because of their different role.' National Gas Company v. Satty, 434 U.S. 142, 98 S.Ct. 347, 351, 54 L.Ed.2d 356 (1977)." Miller-Wohl v. Commissioner of Labor and Industry, etc., (1981), 515 F.Supp. 1264, 1266.

In 27 A.L.R. Fed. 537, 554, § 3[b] are annotations of cases before the Equal Employment Opportunity Commission relating to employers' policies of granting maternity leave only to employees who have been employed for a particular length of time. The EEOC finds such a policy to be discriminatory under Title VII. The reasons given include the fact that such maternity leave policies have a foreseeable adverse effect on the terms and conditions of

female employment, without an equivalent effect upon similarly placed males. In the absence of a legitimate business necessity reason for such a policy, the EEOC takes official notice of the fact that pregnancy, being a natural, expectable, and societally necessary condition, is certain to occur in a statistically predictable number of females in the labor force. Thus, an employment policy of not providing any leaves of absence, although neutral on its face, has an exclusive impact upon female workers in violation of Title VII.

Again, the holding in Abraham v. Graphic Arts International Union, supra, supports our conclusion with respect to the effect of Title VII, where inadequate leave is provided. The United States Supreme Court case of Newport News Shipbuilding And Dry Dock Company v. EEOC, supra, which finds that Title VII mandates equal treatment between male and female employees is in our opinion consonant with what we state here respecting Title VII and the implications of the MMLA respecting Title VII.

For the same reasons, we find that the MMLA is not preempted by either Title VII or the PDA. MMLA is consistent with the federal acts, and they permit state action in the same field. Section 42 U.S.C. 2000h-4; 2000e-7, supra.

VII.

As we noted above, a brief submitted by one set of amici suggested that the MMLA is invalid as being protectionist and paternalistic, but that its invalidity could be saved if this Court would extend the benefits of the MMLA on a gender-neutral basis to all workers.

Although we have found that the MMLA is not violative of federal law, there are, nevertheless, good reasons existing

- 24 -

why the Court or legislature should consider extension of the same benefits.

In Welsh v. United States (1970), 398 U.S. 333, 361, 370, 90 S.Ct. 1792, 1810, 26 L.Ed.2d 308, (Harlan, J., concurring), Justice Harlan suggested a test for determining whether extension or invalidation was appropriate:

> "[i]t is . . . necessary to measure the intensity of commitment to the residual policy and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation." 398 U.S. at 365.

Extension of the reasonable leaves afforded by the MMLA to all workers would indeed further the State's general interest in promoting the health and welfare of all its citizens and the legislature's concern for sexual equality and stable and workable family relationships. It would establish the goal of sexual equality in the work place contemplated by the MMLA and eliminate hostility and resentment toward pregnant workers from those who are denied reasonable disability leaves.

A policy which provided for disability leave without pay for all employees would cause the employer no financial disruption and little administrative expense.

More important to this case, however, extension of such MMLA benefits to all workers would end any argument that the MMLA is indeed sex based discrimination in violation of Title VII. In Hays v. Potlatch Forests (U.S.C.A. 8 1972), 465 F.2d 1081, the Court of Appeals sustained a District Court which had before it an employer-challenge to an Arkansas law requiring overtime pay for women but not for men. The Court of Appeals approved the District Court's order to eliminate discrimination by requiring that the male employees be paid an equal amount for overtime as required for women, finding

thereby no frustration or impedance of the purposes of Title VII. The same rationale applies here.

The legislature will be meeting shortly after the time of this decision. It can take up the question of extending such benefits, in order to save the purposes of the MMLA free from any doubt. We defer extension to the consideration of the legislature. We heartily recommend consideration of such language by the legislature.

## VIII.

In accordance herewith, the judgment of the District Court declaring MMLA invalid is hereby reversed; the order of the Commission awarding back pay and penalties to Tamara Buley is reinstated; this cause is remanded to the District Court for such further proceedings as may be necessary in accordance with this opinion, and with directions to remand to the Commission.

_____
                Justice

We Concur:

_____
        Chief Justice


_____
_____
_____
_____
                Justices

- 26 -